## 9208

## CALLISON *ET AL.* v. PEEPLES *ET AL*

### (86 S. E. 635.)

COUNTIES. ELECTIONS. CERTIORARI. ISSUES. CONDUCT OF ELECTION.

1. ELECTIONS—CANVASSING BOARDS—FINDINGS OF FACT—CERTIORARI.— Unless there is testimony tending to support a finding of fact by a canvassing board, it becomes a question of law to be reviewed upon *certiorari.*

1a. ELECTIONS—STATE BOARD OF CANVASSERS—FINDING CONCLUSIVE.—A finding of fact by the State board of canvassers is not conclusive where there is no evidence to support the finding, or it is against the necessary inference from the facts, since the statute making the findings of the board conclusive presupposes that they must be supported by some evidence.

2. ELECTIONS—CONTESTS—ISSUES.—Where the decision of an election contest is governed by a principle of law, it is not proper for the canvassing board to pass upon irrelevant questions of fact.

3. ELECTIONS—NEW COUNTIES—VOTERS.—In an election upon the question of the formation of a new county, opportunity must be given every qualified voter within the territorial area to be affected, to vote and express his preference for the new county or against it.

3a. COUNTIES—NEW COUNTY ELECTION—QUALIFIED VOTERS—EXCLUSION.—Where in an election to decide the creation of a new county, under Const. 1895, art. VII, secs. 1, 2, the portions of all the townships to be included, except one, had no polling places, the exclusion of the qualified voters therein from voting was illegal.

3b. COUNTIES — NEW COUNTIES — ELECTION — QUALIFIED ELECTORS. — Under Const. 1895, art. VII, secs. 1, 2, providing for the establishment of new counties by election by the qualified electors within the proposed area, all qualified electors within the territory to be included in the new county are entitled to vote on that question, and the legislature cannot deny that right by failing to provide a means of voting for such electors in a statute designed to carry out the constitutional provision.

4. COUNTIES.—The creation of a new county affects not only the political, but also the property rights of the people living within its territorial area.

5. COUNTIES.—When the proponents of a new county show compliance with the constitutional requirements as to inhabitants, taxable property and area, the Governor is authorized to order an election upon the question by the whole electorate, not by a portion of it.

6. ELECTIONS.—Where a majority of the qualified electors are deprived of the opportunity to vote, it casts doubt on the result, as how they would have voted could only be properly determined by allowing them to vote under the provisions of law in that behalf.

6a. ELECTIONS—VOTES—ILLEGAL EXCLUSION—EFFECT.—The fact that certain persons have been illegally prevented from voting will not vitiate the election, if by counting such votes as having been cast against the result obtained there still remains a sufficient majority to establish such result.

6b. ELECTIONS—VOTING—ILLEGAL PREVENTION—EFFECT.—Where a number of voters were illegally prevented from voting, and it is not known how they would have voted, but there are enough votes to have changed the result had they voted against it, the election will be vacated, since, where the irregularity or illegality of an election is such as to place it in doubt, the election must be set aside.

7. ELECTIONS—COUNTIES.—Under Const., 1895, art. VII, secs. 1 and 2, and Civil Code 1912, sec. 641, the commissioners of election should appoint managers for each voting district either partially or wholly within the territory of the proposed new county, so that qualified voters of the district residing within the territory to be affected

might vote, regardless of the circumstance that the box for the precinct itself may be outside of such territory.

8. ELECTION—COUNTIES.—The term "voting place" in Civil Code 1912, sec. 641, refers rather to the whole territory the precinct is intended to cover rather than the particular point where the box is located.

8a. COUNTIES—NEW COUNTIES—ELECTION—"VOTING PLACE."—The provision of the statute that three managers shall be appointed for each "voting place" in the area of the old county proposed to be cut off will be construed to mean the entire territory which the precinct is intended to cover, whether it lies partially or wholly within or without the area of the proposed new county, since in construing the act all doubts are to be resolved in favor of its constitutionality and the evident intent of the legislature.

9. ELECTION—VALIDITY.—Where a sufficient number to change the result, or render it doubtful, have been deprived of their constitutional right to vote at an election, it must be declared void.

10. ELECTIONS — CONTESTS — QUESTIONS.— Where an election must be declared void because of failure to observe one constitutional requirement it is unnecessary to pass upon the constitutional questions which would have arisen had the election been otherwise valid.

Before MOORE, J., Columbia, May, 1915. Affirmed.

Petition for writ of *certiorari* by J. A. Callison, M. E. Quattlebaum, T. A. Robinson, D. L. Burnett, J. P. Quattlebaum, J. D. Moseley, J. W. Golph, S. O. Quattlebaum, T. B. Bell, E. H. Hollingsworth, J. C. Drennan, D. W. Dowtin, C. C. Clinkscales, J. W. Langley and A. E. Hollingsworth, on behalf of themselves and others similarly interested, against T. H. Peeples, chairman of State board of canvassers, R. M. McCown, A. W. Jones, S. T Carter, W. W. Moore and D. B. Carter, constituting the State board of canvassers for the State of South Carolina. The facts are stated in the following order:

This cause comes before me to review the order of the State board of canvassers upon a contest and protest filed against the declaration of the result of an election held in

FOOTNOTE.—As to effect on election of wrongful disqualification of sufficient number of voters to have changed the result, see note in 38 L. R. A. (N. S.) 1007.

Greenwood county upon the formation of the proposed new county of McCormick.

A writ of *certiorari* was issued out of the Supreme Court directing the record to be sent to that Court for review, and on the call of the case it was referred to this Court to pass upon the issues between the parties, and was heard by me under that order.

The facts about which there is no dispute are, that the proposed new county cuts off from Greenwood county the whole of Yeldell township and parts of Troy, Callison, Bradley and Kirksey townships. The voting precincts of the four last named townships were left within the old county and the election was held at only one precinct in Greenwood county, to wit, the precinct in Yeldell township.

Voters from the other townships cut off into the proposed new county were denied the right to vote at the precinct in Yeldell township, because the managers held that only those persons could vote at the precinct in Yeldell township who held registration certificates calling for that particular precinct; accordingly only those qualified electors who lived in Yeldell township and had registration certificates calling for the precinct therein were allowed to vote upon the formation of the proposed new county.

The number of qualified electors residing in those portions of Troy, Callison, Bradley and Kirksey townships, which were cut off into the proposed new county, is greater than the number of qualified electors who voted upon the formation of the proposed new county at the precinct in Yeldell township. This fact is apparent from the testimony of both the contestants and those in favor of the formation of the new county. The testimony does not seriously question the number of qualified electors residing within that portion of these four townships cut off into the proposed new county. For instance, the record shows that in Yeldell township sixty-four votes were cast while testimony of the petitioners show that in that portion of Troy township alone,

cut off into the proposed new county, forty-seven qualified electors reside, and in Callison forty-one, Bradley four and Kirksey two. The testimony on behalf of the proponents of the new county undertakes to reduce this number, but insufficiently to bring the result in dispute. So it is an undisputed fact in the case that there were more qualified electors residing in those portions of Callison, Bradley, Troy and Kirksey townships cut off into the proposed new county, than there were qualified electors who voted at the election held in Yeldell township.

It is also an undisputed fact that six of the parties who voted at the precinct in Yeldell township were registered within thirty days of the election, to wit, on December 7, 1914. The election was held on December 29, 1914.

It is also an undisputed fact in the case that the territory left in Greenwood county has been reduced below five hundred square miles.

The facts about which the record might give rise to some dispute are that there were a sufficient number of qualified electors residing within Troy, Callison, Bradley and Kirksey townships, cut off into the proposed new county, who would have voted against the formation of the new county to have changed the result.

On the hearing of the case before the county board of canvassers affidavits were introduced pro and con to show how qualified electors residing in these four townships would have voted, had they been allowed to vote. Some of these parties made affidavits on both sides of the question, and of those who made such double affidavits, some of them appeared on the trial and testified as to how they would have voted and undertook to explain why they had made affidavits both ways. The contestants introduced the affidavits of fifty-three parties who swore they were qualified electors residing within this territory and would have voted against the formation of the new county had it not been for the fact that their voting precinct was left within the old

county, and for that reason they were not allowed to vote. Twelve of these fifty-three made affidavits on both sides of the question and of these twelve four appeared on the trial and testified that their affidavits in favor of the new county were made under a misapprehension of the facts, and if allowed to vote they would have voted against it.

The county board of canvassers, after going into the matter thoroughly, found the facts practically as stated above. On appeal the State board of canvassers did not undertake to decide these questions of fact, but declared the election upon the face of the returns after deducting those votes which they held to be illegal on account of the fact that they were registered within the thirty-day limit.

The State board declared the election upon the face of the returns, and made no finding as to how many voters reside within the disputed territory, how they would have voted if allowed to vote or how many were in favor of the new county or against it. To construe the decision of the State board as a finding upon these facts would be to disregard the reason upon which its decisions is expressly based, and would be unjust to the board, as well as to the contestants.

But if it were conceded that the State board made such finding on the facts this would not be conclusive; for unless there is testimony susceptible of that inference, it becomes a question of law which the Court will review just as a nonsuit; or the direction of a verdict. The testimony is susceptible of no other inference than that more qualified voters reside within the portions of Troy, Callison, Bradley and Kirksey townships cut off into the new county than voted at the election held in Yeldell township. The testimony of both sides is conclusive as to this. The statute making the findings of fact by the State board conclusive, presupposes that the findings must be supported by some testimony. The jury is the final arbiter of the facts in a law case—made so by the Constitution, yet, where

only one inference can properly be drawn from the testimony—there are no facts to decide and the direction of a verdict becomes proper and necessary to the administration of justice. So it is here. The State board declared the result on the face of the returns and gave its reason for not passing upon the facts, and the results as stated by the board are in consequence of its decision that it was not proper for it to undertake to pass upon the questions of fact involved. The first question which arises under the facts as hereinabove stated is: Who are entitled to vote upon the formation of a new county? To determine this, recourse must be had to the Constitution.

Section 1, article VII of the Constitution of 1895, makes the following provision as to the formation of a new county:

"The General Assembly may establish new counties in the following manner: When over one-third of the qualified electors within the area of each section of the old county proposed to be cut off to form a new county shall petition the Governor for the creation of a new county, setting forth boundaries and showing compliance with the requirements of this article, the Governor shall order an election within a reasonable time thereafter, by the qualified electors within the proposed area, in which election they shall vote 'Yes' or 'No' upon the question of creating said new county; and at the same election the question of a name and county seat for such county shall be submitted to the electors."

Section 2 of the same article makes the following provision:

"If two-thirds of the qualified electors voting at such election shall vote 'Yes' upon such question, then the General Assembly at the next session shall establish such new county."

Authority of the Governor to order an election is based upon a petition of one-third of the qualified electors within the area proposed to be cut off. What is the character of

this election? The Constitution says: "That it shall. be by the qualified electors within the proposed area." No authority is given to order an election for any portion of the qualified electors, but the rights extend to every qualified elector within the proposed area. It is not given to those who may have voting precincts within the area, nor to those who are qualified to vote at any particular precinct, but to the qualified electors within the proposed area, no matter where their precinct is located. In other words, the purpose of the Constitution was to allow every person qualified to vote to express his preference for the new county or against it. Not only is the political rights of the elector affected by the election, but his property rights as well. The character of the election is peculiar in this respect from the ordinary election. It may transfer the property of the proposed electors from one governmental subdivision of the State to another, and proposes to place new burdens upon the people living within the area. The formation of a new county necessarily involves the expenditure of large sums of money, the maintenance and support of many officers and the apportionment of debts of the old county upon the new area, and many other incidents and expenditures it is not important here to mention. So, then, an election on a new county means something more than a mere expression of a political right. It involves, peculiarly, the property rights of every person within the area proposed to be cut off. The Constitution, recognizing this, not only provides that the election shall be by the qualified electors within the proposed area, but further places a limitation upon the number of inhabitants, the taxable property and the area of the proposed new county. This provision is made to protect the electorate of the State against the formation of new counties so small that the burden of taxation would be unreasonable and unjust. When the proponents of a new county are able to comply with those provisions of the Constitution as to inhabitants, taxa-

ble property and the area, and whenever one-third of the qualified electors within such area petitions the Governor, he is authorized to order the election, not for a portion of the electorate, but the whole of it.

Section 2 is conclusive of this construction of section 1. It provides in specific terms for "electors voting at such elections" a very different term from that used in section 1, which is "by the qualified electors within the proposed area." So reading the two sections together the clear purpose of the Constitution is that the election shall be held for the benefit of all of the qualified electors residing within the area proposed to be cut off, and such qualified electors may or may not exercise their right to vote as they see fit, and the result of the election will depend upon those who see fit to exercise the right.

This question arose in *Parler* v. *Fogle,* 78 S. C. 570, 59 S. E. 707, and *Parler* v. *State Board,* 79 S. C. 414, 60 S. E. 967, but was not decided because in the one case it was prematurely raised, and in the other the result of the election was such that if all the qualified voters, who were deprived of the right to vote, had voted against the new county the result would have been the same.

If there was any doubt as to whether the constitutional requirements should be strictly followed, the cases of *State* v. *Shaw,* 9 S. C. 141, and *State* v. *Board of Canvassers,* 78 S. C. 461, 14 L. R. A. (N. S.) 850, 59 S. E. 145, are to the point and conclusive. The contention that the act of the General Assembly made no provision for electors situate as these were is not sufficient to warrant the Court in dismissing their application for protection; for the General Assembly can no more deprive them of their constitutional rights than the proponents of the new county. It makes no difference how or why they were deprived of the right, unless, of course, they themselves were responsible for it. The fact that they were deprived of the right to vote goes to the legality of the election, and its validity depends upon the

determination of what part of the electorate so deprived of the right would be necessary to render the election void.

In *Parler* v. *Fogle, supra,* and *Parler* v. *State Board of Canvassers, supra,* the Court indicated that if there was a sufficient number deprived of the right to vote to have changed the result—counting all against—this would be sufficient.

The true doctrine is, that whenever the irregularity or illegality of the election is such that the result of the election would be placed in doubt, then the election must be set aside. This is the effect of the holding in the case of *Gunter* v. *Gayden,* 84 S. C. 48, 65 S. E. 948, where registration certificates were issued within thirty days of the election. The Court held that the provisions of the Constitution were mandatory and the failure of the managers to comply with it rendered the election void, because it was impracticable to purge the election and the result was, therefore, left in doubt.

In *Wright* v. *State Board of Canvassers,* 76 S. C. 574, 57 S. E. 536, it was held that the failure of the managers to require the production of proof of the payment of taxes and registration certificates, as prescribed by the Constitution, was sufficient upon which to declare the election void. In his concurring opinion, Mr. Justice Woods holds that this was a mere irregularity, so far as the presentation of registration certificates was concerned, and infers that that would not be sufficient to annul the election, unless it would throw doubt upon the result.

In *Davis* v. *State Board of Canvassers,* 86 S. C. 451, 68 S. E. 676, the Court clearly lays down the doctrine that if there were enough illegal votes cast in an election to affect the result or leave any doubt, the election should be held void.

If this is the true doctrine as to illegal votes cast in an election, it would certainly be applicable to an election where

qualified electors were illegally deprived of their right to vote.

The effect of the decision in *Rawl* v. *McCown,* 97 S. C. 1, 81 S. E. 958, is the same, for the Court there declares:

"After deducting the vote of the precincts which should have been thrown out, and all other illegal votes, there still remains a majority in favor of sale."

Probably the first judicial announcement of this rule in our State will be found in the case of *Johnson* v. *Charleston* (1 Bay), 1 S. C. L. 441, where the question arose out of an election for wardens. At page 442, the Court says:

"As to the mode adopted by the council in deducting the bad votes from the highest candidate, it was perhaps the best general rule that could be adopted; for if after such deduction he had still a majority, then this election would stand unimpeached; but if after the deduction the next candidate had an equal or greater number of votes than the other, so as to make it a doubtful case, which one of them really and truly had the greatest number of unquestionable votes, then, according to the principles of free government and the rights of the people, it ought to be sent back to the people at large to determine finally on the point."

The result of the election here would certainly be left in doubt, for it is impossible to say how many of these electors would have voted or how they would have voted. The county board found that 53 of them made affidavits or testified that they would have voted against the new county. The board deducted 12 of these because they had made affidavits favorable to both sides. Without adopting this board's calculations, it is clear that the result would be doubtful, for Yeldell polled 64 votes, of which 51 were "for" and 13 "against," and it would only have taken a few more "against" to have changed the result. Thirteen additional votes would have effected a change in result, assuming all of them would have voted "against." With this number the vote would have stood as follows:

Total vote, plus 13—77; for 51, against 26. Two-thirds are necessary to carry the election, or 52 votes. In Troy alone there were 47 according to proponents. In Callison there were 41, according to contestants, and not less than 30 to both parties. In Kirksey there were 2, according to the testimony of these two, which is not questioned. So there is certainly not less than 76 voters in the contested territory, and how they would have voted could only be properly determined by allowing them to vote under the provisions of law in that behalf.

It was contended that the Constitution did not contemplate that all qualified voters within the area proposed to be cut off should vote, but only those whose precincts were in the new county. The facts of this case illustrate the fallacy of this position. The minority might thus be vested with the power to control the destinies of the majority—a condition subversive of the institutions of a free people, and contrary to every principle of our government.

That it is necessary to declare the act of the General Assembly providing for elections on the question of new counties violative of the Constitution does not necessarily follow. Every doubt ought to be solved in favor of the constitutionality of an act of the General Assembly, and it is not necessary to declare this act void, to effect the result herein mentioned. If it were necessary the Court would not hesitate to do so, for the Constitution is the Magna Charta of the liberty of the people and must be upheld at all cost.

The act is susceptible of such construction as will carry out the legislative intention and do no violence to its expressed terms. The clear purpose of the act is to provide a means by which all qualified electors within the area cut off into a proposed new county may vote upon the question. About this purpose of the General Assembly there can be absolutely no question. The mode provided for, is the appointment of three managers

for each voting place in the area of the old county proposed to be cut off. This means that three managers shall be appointed for each voting district cut into the new county, partially or wholly, so that in this particular case managers should have been appointed for the voting precincts situate in Callison, Troy, Bradley and Kirksey, whether the box for that precinct be within the area, or without. The words "voting place" used in the statute are used in a broader sense than the mere location of the box in the particular precinct. It refers rather to the whole territory which the precinct is intended to cover, than the particular point where the box is located. If this were not so the General Assembly would be placed in the absurd position of undertaking to restrict the limitation placed upon elections of this kind by the Constitution. It was certainly the intention of the legislature to provide for the election, under the requirements of the Constitution, so that all qualified electors in the area cut off could vote upon it. The Constitution itself provides that every elector must vote at his own precinct, so that it could not have been contemplated by this act that electors could vote at any other place than the precinct for which they were registered. If, then, the purpose was to carry out the plain intention of the Constitution, the words "voting place," as used in the statute, must be construed to refer to territory covered by a precinct rather than the location of the box for the precinct, and managers are authorized for the precinct, whether its actual location be within or without. This construction is supported by the rule laid down in *Stackhouse* v. *County Board,* 86 S. C. 419, 68 S. E. 561.

"However plain the ordinary meaning of the words used in a statute may be, the Courts will reject the meaning, when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the legislature, or would defeat the plain legislative intention; and if

possible will construe the statute so as to escape the absurd-
ity and carry the intention into effect.

The cardinal rule that the Court should in all cases give
effect to the obvious intent of the legislature, and that every
technical rule of construction should yield to the clear mean-
ing of the statute, is stated in Endlich on Stat., Inter., sec.
295. Numerous cases in which clerical errors have been
corrected by the Courts pursuant to this principle are given
in section 319 of the same work.

While this rule is generally recognized, the Courts in
applying it should exercise circumspection to avoid any
effort to amend statutes. The principle depends upon the
absurdity being manifest and the legislative intent obvious.
Here it is perfectly obvious that the purpose of the legisla-
ture was to give the electors of Dillon county the oppor-
tunity to decide by an election whether funds should be
provided by issue of county bonds for buildings absolutely
indispensable. What public officials should conduct the elec-
tion was an entirely subordinate matter.

A statute so plain and important in its purpose should not
be declared impossible of execution merely because as to a
subordinate—the method of holding an election—the legis-
lature has used words, which, given their literal meaning,
would impose impossible or absurd conditions. In such a
case the literal meaning of the words must be rejected and a
meaning assigned to them expressive of the legislative
intent, if such intent be plainly indicated to the Court by
consideration of the entire statute, or other statutes on the
same and similar subjects, and by taking into view all the
related facts and conditions."

If this doctrine is applied to the act in question keeping in
mind the obvious and manifest intention of the General
Assembly, the construction to be placed upon it is clear and
there is no necessity for declaring it unconstitutional,
or defective. The construction placed upon the act,
conforming it to the intention of the General Assem-

bly made evident from its expressed terms, would authorize the appointment of managers of election for voting districts partially cut by new county lines where the box itself is left on the outside.

This being so, it was the duty of the commissioners of election for Greenwood county, to have appointed managers in Troy, Callison, Bradley and Kirksey for the precincts in those townships, in order that all electors residing within the area of the township cut into the new county could have the opportunity to cast their votes. Failing to do this, those electors were deprived of their constitutional right and should be protected, especially where it is apparent that there were more than enough of them to have changed the result of the election, or, at least, rendered the result very doubtful.

Having reached the conclusion that the election must be declared void, it is unnecessary to pass upon the interesting question whether Greenwood county is an "old county" within the meaning of the Constitution, and, therefore, cannot be reduced below five hundred square miles. The Supreme Court, in *Rhame* v. *DuRant*, 93 S. C. 217, 76 S. E. 611, considered the question and were divided upon the construction to be placed upon sections 4 and 5 of article VII, but inasmuch as the construction of those sections were only indirectly before the Court, the construction of section 7 being under consideration, the question was left open. I am content to leave them thus, until their construction becomes necessary.

For the reasons stated the decision of the State board of canvassers should be reversed and the decision of the county board affirmed, and it is so ordered.

The State board of canvassers appeal on the following exceptions:

1. His Honor erred, after holding that "the facts about which the records might give rise to some dispute are that

there were a sufficient number of qualified electors residing within Troy, Callison, Bradley and Kirksey townships, cut off into the proposed new county, who would have voted against the formation of the new county to have changed the result," in holding that the State board did not settle, determine and find the facts to be that the result would not have been effected or changed in this election, if these parties had voted.

2. His Honor erred. in holding that "on appeal the State board of canvassers did not undertake to decide these questions of fact, but declared the election upon the face of the returns;" whereas, he should have held that the State board found and declared the facts to be that the result had not been affected by the failure of these parties to vote and would not have been changed had they voted.

3. The presiding Judge erred in holding that "while it was contended before me that the State board of canvassers did decide these facts adversely to the contestants, this contention is contrary to the clear declaration of the board. * * * The State board declared the election upon the face of the returns, and made no finding as to how many voters reside within the disputed territory, how they would have voted if allowed to vote, or how many were in favor of the new county or against it;" whereas, he should have held that the State board declared the result in accordance with the face of the returns only after having first determined and found the facts to be that the result would not have been effected or changed had these parties voted.

4. The presiding Judge erred in holding, "but if it were conceded that the State board made such finding on the facts this would not be conclusive;" whereas, he should have held that the statute giving the authority to the State board of canvassers to declare the result of this election made such finding and declaration absolutely conclusive, and denied the Court any authority to pass upon any of the facts growing out of the contest.

5. His Honor erred in holding that only one inference could be drawn from the facts in this case; and that, therefore, the action of the State board of canvassers was really declaration of the result on the face of the returns without regards to the effect on the result of the fact that certain voters could not vote; the error being that there was testimony before the State board pro and con as to the effect on the result of the fact that certain voters could not vote, from which facts more than one inference could be drawn, and from which, as a matter of fact, the State board found and declared that the result would not have been effected or changed.

6. His Honor erred in holding that under sections 1 and 2, article VII of the Constitution, that those who were not able to vote in this election, by reason of their voting place being without the line of the proposed new county, were qualified electors under Constitution and entitled to vote in this election upon the new county issue.

7. His Honor erred in holding that the Supreme Court decided in *Parler* v. *State Board,* 79 S. C. 414, 60 S. E. 967, that all of the voters who could not vote, were to be considered in determining the effect on the result of the election as being opposed to or voting against the new county.

8. His Honor erred in holding that the election was rendered uncertain or doubtful on account of the inability of these parties to vote, and that this should be treated the same as illegal votes are treated when they render the result of an election uncertain or doubtful; whereas, he should have held that as in case of illegal votes where the effect of illegal voting may be determined, the result will not be considered doubtful or uncertain, so here, it being practical to determine the effect on the result of these parties not being able to vote, the result on that account was not rendered doubtful or uncertain.

9. His Honor erred in holding that "the result of the election here would certainly be left in doubt, for it is impos-

sible to say how many of these electors would have voted or how they would have voted;". whereas, he should have held that the effect on the result of the fact that certain voters could not vote could be practically determined.

10. His Honor erred in holding that a proper construction of the statute under which this election was held gave authority to the commissioners of election to place boxes for the purpose of this election in the townships of Troy, Callison, Bradley and Kirksey, within the lines of the proposed new county; the error being that the statute specifically required that the commissioners of election appoint managers for the voting places within the territory for the proposed new county, and it was error to hold that voting for the proposed new county, and it was error to hold that voting place here in this statute meant voting precinct, and that the voting places as fixed by statute could be for the purposes of this election moved to some place within the lines of the proposed new county.

11. His Honor erred in not passing upon and not holding that Greenwood county could be reduced below five hundred square miles under the Constitution.

12. His Honor erred in reversing the decision of the State board of canvassers and in declaring the election to be null and void.

13. The presiding Judge erred in considering, passing upon and reversing the State board on matters of fact; the error being that the Court is without jurisdiction to pass upon the facts in this case, the statute law of the State having given this authority solely and only to the county and State board of canvassers.

*Mr. R. H. Welch,* for appellants, submits: *The decision of the State board of canvassers was final on questions of fact:* Civil Code 1912, secs. 641 and 642; 79 S. C. 416; 65 S. C. 85. *As to reduction of area of old county:* 93 S. C. 217; Const., art. VII, sec. 7. *Voting place established by*

*the legislature cannot be moved by the managers.   Election could not be held at boxes without area of proposed new county:* Const., art. VIII, sec. 1.   *The inquiry is, then, why was no provision made so that every one in the territory could vote?   The answer is that this was not practical under the Constitution, and this the General Assembly saw.   The Constitution had just regulated the right of suffrage.   To fully accomplish its object and make the same effective it laid down certain fixed rules for voting.   It provided, as to polling precincts:* "(a) *The General Assembly shall provide for the establishment of polling precincts in the several counties of the State* \* \* \*; (b) *Each elector shall be required to vote at his own precinct* \* \* \*; (c) *Provision shall be made for his transfer to another precinct upon his change of residence:*" Art. II, sec. 9.   *As to qualifications of suffrage:* "(a) *Registration, which shall provide for the enrollment of every elector* \* \* \*; (b) *The General Assembly shall provide for issuing to each duly registered elector a certificate of registration* \* \* \*:*" Art. II, sec. 4, subdivisions (a) and (b).   *These constitutional provisions received immediate legislative construction at the 1896 session of the General Assembly:* 22 Stats., p. 32, sec. 9; p. 44, sec. 22; Civil Code 1912, secs. 219, 239.   *It is plain, therefore, that the Constitution meant to limit the right of the elector to vote strictly at the polling place where his registration certificate read for and nowhere else.   Now, then, is it not clear that these parties, in order to have voted, would have had to have had their voting places outside of the area of the new county opened on the day of the election?   They were registered there.   They could not change or transfer to some inside box, for only upon a change of residence does the Constitution permit or provide for a transfer.   But should the boxes on the outside have been opened, then what would have become of the constitutional provision, art. VIII, sec. 1, requiring the election to be held in the territory?   To have opened the boxes on the outside would have been to*

hold the election on the outside as well as on the inside of the territory. But, it may be argued that the words "within the proposed area" refer to the "qualified electors" just preceding them. The General Assembly of 1896, with a great many of the ablest members fresh from the constitutional convention, however, construed "within the proposed area" to refer to the election as well; and hence it provided that boxes only should be opened therein. This is a legislative construction of the meaning of the Constitution, which is entitled to great weight and respect: 76 S. C. 590. Then, how did they expect every voter in the territory to be able to vote? Did they, as a matter of fact? Turn to Const., section 2, art. VII, for an answer. Does this not show that they realized that there would be those who were qualified to vote in general and other special elections who would not be able to vote in a new county election? "Two-thirds of the qualified electors voting at such election." "Two-thirds of those voting in such election." Where else does this expression occur? Was it inserted to avoid the construction that the two-thirds vote required would have to be two-thirds of all the qualified electors in the territory? Certainly not. A majority vote, a two-thirds vote, a three-fourths vote, etc., means, of course, of those voting, and no provision is necessary to be inserted in order to guard against any other construction. Why, then, was this expression inserted in section 2 of art. VII? It means that the framers of the Constitution saw the whole situation, and determined that a two-thirds vote of those able to vote at the election held within the proposed area should be sufficient to create a new county. And this means that for the purpose of this election there may be and often will be those so situated, as some were here situated, with regards to their voting places as not to be able to vote. As to these the Constitution does not confer upon them the right to vote in this election: See 78 S. C. 574; 65 S. C. 85; 54 S. C. 25.

*Messrs. Grier, Park & Nicholson,* for respondents, cite, as to: *1. Who are entitled to vote on the formation of a new county?* Const., art. VII, secs. 1, 2; 78 S. C. 574; 79 S. C. 414; 9 S. C. 141; 78 S. C. 461. *2. What part of the electorate deprived of the right to vote would be necessary to render an election void?* 78 S. C. 570; 79·S. C. 414; 84 S. C. 48; 76 S. C. 574; 86 S. C. 451; 97 S. C. 1; 1 Bay. 441. *3. Does the statute relative to the formation of new counties —applied to the facts of this case—meet the requirements of the Constitution?* Civil Code 1912, sec. 641; 86 S. C. 419. *4. Can Greenwood county be reduced below the five hundred square mile constitutional limit?* 93 S. C. 217.

October 14, 1915.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

The opinion of the Circuit Court satisfactorily disposes of all the questions properly before this Court and necessary to the decision.

Judgment affirmed.